JUDGE HERB ROSS (Recalled)

# UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF ALASKA

**605 West 4th Avenue, Room 138, Anchorage, AK 99501-2253 — (Website: www.akb.uscourts.gov)**
**Clerk's Office:  907-271-2655 (1-800-859-8059 In-State) — Judge's Fax:  907-271-2692**

**Filed On
6/1/10**

| | |
|---|---|
| In re | Case No. A09-00631-HAR |
| | In Chapter 11 |
| DUKE INVESTMENTS, LLC, dba Chili's Grill & Bar | |
| | **MEMORANDUM DECISION FOR CONFIRMATION OF PLAN** |
| Debtor(s) | |

*A Prisoner's Dilemma* (Wikipedia): *The prisoner's dilemma is a fundamental problem in game theory that demonstrates why two people might not cooperate even if it is in both their best interests to do so.*

*Morton's Fork*: *noun: A situation involving choice between two equally undesirable outcomes.*

*Yogi Berra*: *When you come to a fork in the road, take it.*

## INDEX

Topic                                                                                       Page

1- <u>SUMMARY OF DECISION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2- <u>BACKGROUND</u>-  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3- <u>ANALYSIS</u>- . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    3.1- <u>New Value and Cram Down</u>-  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    3.2- <u>Authority of David Duke to Impose the Plan of the Minority LLC Members</u> . . . . . 16
    3.3- <u>The Assumability and Assignability of the Franchise</u>-  . . . . . . . . . . . . . . . . . 17
    3.4- <u>Feasibility (and, What if Lori Leaves?)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    3.5- <u>The Prisoner's Dilemma (Dr. Lange and John DeHaven)</u>- . . . . . . . . . . . . . . . 19

4- <u>CONCLUSION</u>- . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1- **<u>SUMMARY OF DECISION</u>**- The plan[1] will be confirmed. Debtor's performance as a restaurant owner has appreciably improved in the 8½ months since this chapter 11 was filed and the plan has a reasonable chance of succeeding.

Under the plan the debtor will: (a) assume its three restaurant leases and cure rent arrearage; (b) assume its equipment leases; and, (c) assume its franchise agreement and cure defaults. David Duke, 50.1% of LLC debtor, will contribute $100,000 in cash on confirmation and acquire 100% ownership interest.

Some minority LLC members and the Anchorage landlord object to confirmation. They want the Fairbanks lease to be rejected. They question David Duke's business abilities. They object to losing their equity.

In the milieu of this case, the plan complies with the regular and cram down provisions of chapter 11. It offers the best chance for creditors to recover on their claims and for 200 employees to keep their jobs. And, confirmation is the most likely way to ameliorate the possible claims against the disenfranchised members due to their continuing guarantees of the debtor's obligations.

2- **<u>BACKGROUND</u>**- **_The Chili's Franchise Operation_**- The debtor operates Chili's three restaurants in Alaska – Anchorage (commenced in 2002), Fairbanks (2005), and Wasilla (2008) – under a development agreement with Brinker International requiring the opening of three locations in Alaska. There is supposed to be a synergy or economy of scale in having at least three restaurants.

The debtor is about $200,000 in arrears with Brinker at the time of confirmation.

**_<u>The Original Members</u>_**- The initial members of the LLC were: David Duke, Jaqueline Goode (Duke's mother), John DeHaven, and Jason Kimmel. Duke and his mother put in money, and Duke was the manager of the LLC. DeHaven and Kimmel were sweat-equity partners (there

---

[1] *Debtor's First Amended Plan of Reorganization Dated April 23, 2010*, Docket No. 192. The confirmation hearing was held on May 27 and 28, 2010.

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

1   was no testimony that they contributed cash or property, but if they did it was apparently a much

2   lesser amount than Duke's or Goode's contributions).

3        The other initial or early LLC member was DeHaven's cousin, Dr. Richard Lange.  Lange is

4   a physician and professor of medicine, with an MBA from Johns Hopkins and management

5   experience in health care organizations.  He got involved to help his cousin, John DeHaven.

6   Lange did not contribute money, but lent his financial and professional gravitas to the startup of

7   the debtor's restaurant business by guaranteeing the Brinker franchise agreement and the

8   Anchorage leases (there are two Anchorage leases, one for the restaurant building and the other

9   for its adjacent parking lot, and I am not clear if Lange guarantees both, but he is on the hook for

10  a lot of money if there is a default).

11       ***The Anchorage Location***-  The Anchorage location, which opened in 2002, was a hit,

12  setting a record for new locations in the Chili's franchise.  At first, Duke acted as the CEO,

13  DeHaven was the director of operations and development, and Kimmel was director of the food

14  and beverage department.

15       MCN and JCN are the landlords for the Anchorage location and the lease payments run

16  around $52,000 per month.  The arrearage at the time of confirmation is about $130,000.  The

17  landlords, MCN and JCN, have been active in this case and vocal in their criticism of David

18  Duke's management abilities and his desire to assume the Fairbanks lease.

19       ***The Fairbanks Location***-  Brinker eventually pushed the debtor to open the two remaining

20  proposed locations.  The debtor chose Fairbanks as its next restaurant site.  The location chosen

21  was owned by Alma Corporation, of which David Duke was a 100% owner.  Alma owned the raw

22  land at first and eventually entered into an agreement with Wellsprings Holdings, LLC, a

23  company owned 100% by Dana Martens.  A new entity was formed called Alma-Wellsprings,

24  LLC, to own the land and construct the Fairbanks Chili's restaurant building.[2]

25  _____

26       [2] Debtor's Exhibit 6 is a diagram of the ownership structures of Alma-Wellsprings, LLC and Duke
    Investments, LLC, the landlord and tenant of the Fairbanks restaurant, as they existed in about 2006 .

27

28  MEMORANDUM DECISION FOR
    CONFIRMATION OF PLAN                                                          Page 3 of 21

The Fairbanks construction was financed by a GE Capital entity.  The building was to cost about $4 million, but Duke said it eventually came in at $5 million due to cost overruns and construction problems.

John DeHaven oversaw the construction in Fairbanks for the debtor's benefit.  Both DeHaven and Duke point the finger at each other as being a major cause of the construction problems.  Duke said DeHaven had relationship problems and substance abuse issues that hampered his performance and he also failed to tie up acquisition of the liquor license so there was no license for the first six months of operations.  DeHaven said that Duke designed too large of a building for Fairbanks which is costly to heat in the extreme winters.

Duke testified he put up $1.5 million in cash and land for construction of the Fairbanks locations, presumably mostly for Alma-Wellsprings.  Martens also pledged property owned by some of his companies to help finance the construction.

Although construction had already begun earlier  in 2005, it was not until July 25, 2005, that Alma-Wellsprings, the landlord, and Duke Investments, the tenant, came to an "agreement" on rent for the building and furniture, fixtures and equipment.  A document called *Agreement Between Alma Corporation and Wellsprings Holding, LLC* and dated July 25, 2005, was executed. It was signed by David Duke for Alma and Dana Martens for Wellsprings, and by John DeHaven at the foot, without a signature line, and without explanation of the purpose of his signature.  The agreement says a copy of the form of the lease is attached to the one-page agreement, but that provision appears to be stricken.  The complicated formula in the lease indicates the rent was to have been $52,000 per month, or more, depending on the cost of financing.[3]

From this testimony I find that at least John DeHaven had knowledge of the proposed lease and David Duke's ownership interest in the landlord, Alma-Wellsprings.  It also tends to

---

[3] Debtor's Exhibit 1.

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

1  show the lease was not formally approved by Duke Investments, LLC, in accordance with the

2  required legal formalities under Alaska law governing limited liability companies.[4]

3      The debtor also guaranteed the GE Capital loan to Alma-Wellsprings, which is a sore point

4  with Dr. Lange – i.e., that the tenant guaranteed the landlord's mortgage.[5]  Although he, himself,

5  does not personally guarantee the Fairbanks lease to Alma-Wellsprings or GE Capital, he points to

6  the debtor's guarantee as unusual and indicative of the conflict of interest of David Duke – i.e.,

7  the LLC tenant should not have guaranteed the Alma-Wellsprings landlord's obligation to GE

8  Capital and doing so jeopardized the LLC for Duke's personal, financial interest.  There is

9  argument (and perhaps some testimony) that GE Capital required a franchisee's guarantee, so the

10  debtor's guarantee was not unusual in the context.

11      Dr. Lange says he was not aware until 2009 (shortly before the petition was filed) of the

12  terms of the lease or the apparent conflict of interest due to David Duke being part of the owner

13  of the landlord group.  He and other objectors have argued that David Duke should not have been

14  involved with approving the lease for the debtor without disclosing his conflict and should not

15  have voted on it, citing LLC law to that effect.[6]

16      Dr. Lange is a credible witness, but I believe that he was kept informed of the debtor's

17  operations, to the extent he wanted to be, through his cousin, John DeHaven.  He considered

18  himself a passive partner and did not inquire.  As an LLC member, he should not have had to

19  inquire and should have been notified, but I find the lack of communication, if it happened as he

20  said, was not diabolical.  It was not until about 2009, when he learned that Brinker looked to him

21

22

23      [4] AS 10.50.010, *et seq.*

24      [5] Dr. Lange testified at the confirmation hearing on May 27, 2010, and filed a declaration and
opposition to confirmation.  *See, Amended Declaration of Richard Lange,MD, MBA*, Docket No. 212, and

25  *Objection to Approval of Disclosure Statement and Confirmation of Plan*, Docket No. 205.

26      [6] *See*, Dr. Lange's *Objection to Approval of Disclosure Statement and Confirmation of Plan*, Docket No.
205, citing AS 11.50.140(a) about the requirements of disclosure of a conflict of interest by a member of an LLC.

27

28  MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

1    for almost $200,000 in delinquent franchise fees, that he realized that his attempt to help his

2    cousin, John DeHaven, was turning into an enormous financial liability.

3        I find that David Duke did not abide by the Alaska LLC requirements of disclosure and

4    abstention from voting, but that he did not attempt to hide the relationship.  The Fairbanks

5    restaurant opened in November 2005, and operated almost four years before this bankruptcy was

6    filed, and any improprieties regarding the inception of the lease cannot be unwound at this late

7    stage and have been waived so far as they effect confirmation.

8        One of the contentions of the minority members (excluding Jacqueline Goode, David

9    Duke's 83 year old mother) is that the cash drain of the Fairbanks operation is one of the major

10   reasons for the financial difficulties of the debtor (the other being David Duke's incompetence as

11   its manager) and that the Fairbanks lease should not be assumed.  They would prefer to keep their

12   membership interests and proceed with only the Anchorage and Wasilla operations, waiting for a

13   *deus ex machina* to save the enterprise.

14       David Duke attributes the problems in Fairbanks to the cost overruns (for which he blames

15   John DeHaven) and the mismanagement of operations, once the restaurant was opened due to

16   DeHavens substance abuse and romantic entanglements while in charge.  Ultimately DeHaven

17   was replaced as the Fairbanks manager for a brief time by Jason Kimmel, another member.

18   Kimmel did not like living in Fairbanks, and left in about March 2006. He ultimately sold his

19   membership share to David Duke in 2006.

20       Since then, up until the bankruptcy filing, Fairbanks had been a money loser, difficult to

21   staff with competent managers and employees or control remotely from the Anchorage home

22   base.  In the process it did not comply with some of Brinker's franchise guidelines, to the

23   displeasure of the franchisor.

24       The objections to confirmation are based on the assumption that Fairbanks is a key source

25   of the cash drain on the debtor and that this cannot be fixed.  They also argue that a significant

26   portion of future revenue is likely to be lost due to the deployment in the near future of the

27

28   MEMORANDUM DECISION FOR
     CONFIRMATION OF PLAN                                                    Page 6 of 21

Army's Stryker Brigade stationed in Fairbanks to Afghanistan.  At confirmation, the debtor offered credible testimony, which was barely challenged, that the Fairbanks location is necessary to the reorganization and a temporary deployment can be weathered.[7]

*The Wasilla Locations; Some New Members*- In 2008, the debtor (under prodding from Brinker) opened its third restaurant in Wasilla, Alaska, in a location built for debtor by the landlord, John Emmi.  To help finance this, David Duke brought in two new investors as members, Leslie Anderson and Robert Wurm.  Both are Alaska businessmen (Wurm lives in Washington state, but operates a business in Alaska).[8]  They each invested $225,000 to each purchase a 7½% share of the debtor from David Duke's stake.  Les Anderson candidly admitted he was not misled by David Duke and simply had not done enough due diligence to understand the precariousness of the company in 2008.  Anderson and Wurm are aligned with Dr. Lange and John DeHaven in opposing confirmation.

*Things Unravel in 2009*- Debtor could not meet all its rent and other ongoing operational expenses by 2009, and was having trouble meeting payroll and paying Brinker.

The members at the time (except for Ms. Goode) – Duke, Lange, DeHaven, Wurm and Anderson – tried weekly brainstorming sessions to try to figure how to turn the company around. The other members said that Duke participated for a while, but then stopped attending; essentially he closed down most communications with his partners.

He and John DeHaven did not get along, and he "fired" him as manager of the Wasilla location.  He said he was unsure of his authority to do this, but had to act under the circumstances.  Dr. Lange did not protest the firing, but thought that DeHaven still was entitled to a voice as a member, which was not being honored.

---

[7] Testimony of debtor's controller, Lori Carr, and:  Exhibit 3, *Duke Investments, Projections 2010-2014, May 27, 2010;* Exhibit 4, *Duke Investments, Projections 2010-2014, May 27, 2010 (assuming less Fairbanks revenue);* Exhibit 5, *Duke Investments, Projections 2010-2014, May 27, 2010 (without Fairbanks).*

[8] *See, Amended Declaration of Robert Wurm,* Docket No. 213, and *Amended Declaration of Leslie Anderson,* Docket No. 208.

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN                                          Page 7 of 21

In desperation, Duke had arranged a loan from Advance Restaurant Finance (ARF), a high risk, high interest lender.  The loan bore about 42% annual interest and the debtor paid almost $400,000 in interest, without reducing the $375,000 principal at all, and was about to go into default.

David Duke asked Dr. Lange to try and renegotiate the loan terms with ARF.  When Lange started investigating the situation he was appalled at the draconian terms and the fact that David did not seem to understand what he had gotten the company into.  From this, Dr. Lange concluded that David Duke did not understand finances or how to read a profit and loss statement.

I find this is probably an overstatement.  David Dukes resumè includes significant experience in owing and running businesses.[9]  His turning to ARF in desperation was probably due to the dire straits of the company, his butting heads with his partners without any solution, the stress of trying to save a failing business, and, possibly, the personal tragedy of the death of his daughter in this time period.

Although Lange asked him not to without the consent of the rest of the members, Duke recommitted the company to a high interest rate ARF loan.

***The Bankruptcy Filing and Operations in Bankruptcy***- The debtor filed a chapter 11 petition on September 15, 2010, with David Bundy, Esq., acting as its attorney.  Before filing, the other members were polled and none expressed support for, or disagreement with, filing the chapter 11.  It is probable that debtor would have been out of business in September, or shortly thereafter, if bankruptcy protection had not been sought.

Chapter 11 is usually a process of intense negotiations with creditors.  Not only did the debtor have to improve the way it operated the restaurants (increasing revenue, controlling costs, managing employees efficiently, and preserving the Chili's brand), but it had to cut deals with its

---

[9] *See*, Exhibit F - Resumés, to *Debtor's First Amended Disclosure Statement Dated April 23, 2010*, Docket No. 193.

creditors so they would give the debtor enough breathing room to reorganize.  Both these things have been done well in the context of this case – debtor's operations have improved markedly and debtor has negotiated deals with all its major creditors.

Debtor has improved the operations of all locations to make them more profitable.  It has done this largely through the efforts of Lori Carr, its controller, and David Duke, who has performed tasks once spread among three members (Duke, DeHaven and Kimmel) by himself.  Ms. Carr's projections have proved remarkably accurate as verified by the monthly operating reports required by the US Trustee.  I will discuss the possible effect of Lori Carr's leaving the debtor after confirmation in more detail in the Analysis portion of this memorandum, in ¶ 3.4.

In addition, the debtor has been able to cuts deals with its creditors, particularly the landlords and the franchisor, whose support it has earned.  Here's a summary of what has been accomplished:

- **Anchorage lease** with MCN/JCN- debtor got the landlord to agree to an assumption and cure under 11 USC § 365(b)(1), reversing its earlier objection.  This landlord has offered some of the most intense opposition to including the Fairbanks location in the reorganization and David Duke's management, and still expresses opposition to the Fairbanks lease assumption,[10] but I sense the intensity of its opposition has moderated in light of the favorable deal it has cut for itself.

- **Wasilla lease** with John Emmi- due to the constraints on lease assumption under BAPCA,[11] the debtor had literally almost run out of time to prevent this lease from expiring automatically if the landlord had not given debtor a little more time to negotiate a settlement regarding its defaults under the Wasilla lease.  The debtor and the landlord eventually made a deal and the landlord now supports the plan.

---

[10] *See, MCN's Objection to (i) Adequacy of Disclosure Statement, & (ii) Plan*, Docket No. 202.

[11] 11 USC § 365(d)(4), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

- **Fairbanks lease** with Alma-Wellsprings- this is the insider lease that Dr. Lange says should be rejected.  The debtor has worked out a modification of the lease agreement with Alma-Wellsprings (the insider landlord), which required also the compromise of GE Capital which holds the mortgage on the landlord's property. Dana Martens indirectly now owns a majority interest in Alma-Wellsprings and is the source of the $100,000 cash contribution by David Duke.  I will discuss in more detail in ¶ 3.5 why this arrangement should be sanctioned.  The disclosure statement and testimony in behalf of the plan proponent argue that the reorganization will fail without the Fairbanks operation.

- **Brinker franchise** for the Chili's restaurants- the debtor has negotiated an acceptable payback of the approximate $200,000 in arrearage of franchise fees. More importantly, debtor has obtained the support of Brinker, which will allow the debtor to assume the franchise agreement and use the Chili's brand.[12]  Brinker  had its doubts at the beginning of the case that the debtor could survive chapter 11, but Brinker has been pleasantly surprised how debtor's operations improved as the chapter 11 progressed.  As discussed in ¶ 3.3 of this memorandum, under the case law in the 9th Circuit, Brinker had an absolute veto power on the franchise assumption. Brinker also indicates it would not look favorably on a chapter 11 trustee taking over the reins from David Duke because of the implicit danger it might pose to the Chili's brand.

- **Food Services of America**- the debtor reached an agreement with FSA concerning its $203,000 administrative claim for goods received by the debtor within 20 days of the bankruptcy filing.[13]  FSA agreed to accept $50,000 in cash at the effective date,

---

[12] *See, Brinker International's Support of the Debtor's First Amended Chapter 11 Plan*, Docket No. 197.

[13] 11 USC § 503(b)(9) and, *see*, 11 USC § 502(a)(2)

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

and the balance on terms.  The $50,000 will come from David Duke's $100,000 cash contribution upon confirmation.  FSA could have blocked confirmation by demanding a payoff of the entire administrative claim (which is more than debtor can currently pay), but debtor was able to negotiate a compromise.[14]

- **Delta Leasing**- the debtor reached a settlement with its major equipment lessor about curing its arrearage.
- **Advanced Restaurant Finance**- the debtor and ARF, which has a lien on debtor owned restaurant equipment, etc., reached a consensus, and ARF will elect to be paid under § 1111(b).[15]

In each of these cases, the creditor and the debtor faced a prisoner's dilemma, but figured out a compromise so they could share the same lifeboat, the reorganized debtor.

Dr. Lange still opposes the plan, and sees too much jeopardy for himself if the plan fails to perform (because of either David Duke's inability to manage and/or the Fairbanks location dragging down the whole enterprise) and he is ultimately called upon to honor his guarantees to Brinker on the franchise agreement and MCN/JCN on the Anchorage leases.  Dr. Lange argues for assumption of Anchorage and Wasilla and rejection of the Fairbanks lease.  He says Fairbanks has no choice but to accommodate the debtor on favorable terms, notwithstanding a formal rejection of the lease.

He has valid concerns, but I will discuss below in ¶ 3.5 why I think these arguments are insufficient to defeat confirmation, which is in the best interest of all, including Dr. Lange, in my opinion.

The debtor currently employs about 200 people in its three restaurant locations, who will retain their jobs because of confirmation of the plan.

---

[14] 11 USC § 1129(a)(9)(A).

[15] 11 USC § 1111(b).

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

1   3- **ANALYSIS**-

2   3.1- **New Value and Cram Down**-  At least one class voted for the plan, Class 2, the

3   general unsecured claims of $1,000 or less.  Class 1 (general unsecured claims of more than $1,000)

4   may or may not have voted in favor, but the debtor has never produced a final analysis, so I will

5   assume that the debtor must cram down on that class to confirm a plan.[16]

6   If a class of unsecured claims has not agreed to a chapter 11 plan by the requisite

7   majority,[17] a junior class of claims or the equity interests cannot receive or retain anything under

8   the plan without the consent of the class that rejected the plan, unless the class is paid in full with

9   interest.[18]  This is a statutory embodiment of the absolute priority rule from days of the

10  Bankruptcy Act prior to the 1978 Bankruptcy Code.  The absolute priority rule also held that a

11  plan had to be fair and equitable and not unfairly discriminate against any class of creditors or

12  interests.[19]

13  The question in this case becomes, does David Duke's winding up with a 100% ownership

14  under his plan run afoul of the absolute priority rule?  Class 1, the majority of the unsecured debt,

15  is to receive 50% of their allowed claims way down the road, beginning in annual installments

16  from 2015-2019.  David Duke's retention of his equity interest in the debtor would contravene

17  the absolute priority rule unless he can otherwise qualify to continue as an equity owner under

18  another theory, in this case, the new value exception.

19

20

21  _____

22  [16] 11 USC § 1129(b); 7 *Collier on Bankruptcy*, ¶ 1129.03 (Matthew Bender Online ed 2010).

23  [17] 11 USC § 1126(c), requiring acceptance of a class to be by two thirds in amount and a majority in
    number of allowed claims of creditors in that class who have voted.

24
    [18] 11 USC § 1129(b)(2)(B); 7 *Collier on Bankruptcy*, ¶ 1129.04 (Matthew Bender Online ed 2010).  The
25  absolute priority rule for an individual debtor chapter 11 after BAPCA. *See*, *e.g.*, 11 USC § 1115(b).

26  [19] 7 *Collier on Bankruptcy*, ¶ 1129.03[4][a][i] (Matthew Bender Online ed 2010); Case v Los Angeles
    Lumber Co., 308 US 106 (1939).

27

28  MEMORANDUM DECISION FOR
    CONFIRMATION OF PLAN                                                        Page 12 of 21

David Duke has offered to conribute $100,000 in cash on the effective date to acquire 100% ownership in the debtor under the new value exception.  This is a pre-1978 rule that was not explicitly adopted or abrogated by passage of the 1978 Bankruptcy Code.  Although there is debate as to whether, or to what extent, the new value exception has survived the enactment of the 1978 Bankruptcy Code, the 9th Circuit has ruled that it did survive in Bonner Mall.[20]  The new value rule is summarized in Bonner Mall as follows:[21]

> Under pre-Code Bankruptcy Act practice, a plan that allowed stockholders in the business that had filed for bankruptcy protection (old equity) to receive stock in the reorganized debtor in exchange for contributions of added capital (new value) could under certain conditions satisfy the absolute priority rule and be considered "fair and equitable" even though a senior class was not paid in full.

To qualify as new value, a contribution has to meet five requirements, taken from pre-Code case law:[22]

> Former equity owners were required to offer value that was 1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received.

Under the plan, Duke is giving new money ($100,000) which is necessary for a successful reorganization (provides cash to pay the $50,000 amount on confirmation that FSA is requiring to allow the balance of its § 503(b)(9) administrative expense to be deferred).  This satisfies requirements 1, 3 and 4.

Is it substantial (requirement number 2)?  In Ambanc La Mesa Limited Partnership,[23] the 9th Circuit said a court could short circuit the five step inquiry if it found the proposed

---

[20] Bonner Mall Parnership v U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership), 2 F3d 899 (9th Cir 1993), *cert. granted*, 510 US 1039 (1994), *motion to vacate denied and case dismissed*, 513 US 18 (1994).

[21] In re Bonner Mall at 906 [citations omitted].

[22] In re Bonner Mall at 908 [citations omitted].

[23] Liberty National Enterprises v Ambanc La Mesa Limited Partnership (In re Ambanc La Mesa Limited Partnership, 115 F3d 650, 654-56 (9th Cir 1997), *cert. denied*, 522 US 1110 (1998).

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

1    contribution was *de minimus*. It cited a 7th Circuit single asset real estate case which held that a

2    cash contribution amounting to 3.8% of the general unsecured debt (a $100,000 cash contribution

3    and $2.6 million in unsecured debt) was not substantial.[24] Those ratios seem close to the figures in

4    this case: $100,000 contribution; about $2.4 million in unsecured debt).[25] The debtor says the

5    unsecured debt is really closer to $1 million, but has not given the court a concrete analysis

6    showing that $1 million is closer to the truth.

7        Nonetheless, I think under either level of unsecured debt, $100,000 qualifies as substantial

8    in this case. Without a contribution of this nature, this case is ready to go off the cliff because

9    debtor is about to lose its Wasilla lease if a plan is not confirmed and possibly could not cure its

10    Anchorage lease default. The money includes an amount which is large enough to procure FSA's

11    buy-in. And, comparing the amount of cash contribution to the amount of unsecured debt seems

12    to be something of a *non sequitir* – a heuristic to resolve the issue without a full blown analysis.

13        There is no bright-line rule that a small percentage, below a certain amount, is

14    automatically insubstantial.[26] "Whether the infusion of new capital is "substantial" is more a

15    common sense determination than a mathematical calculation when the debtor comprises only a

16    single real estate asset which is fully encumbered."[27]

17        In this case, I find that the $100,000 is "substantial."

18        Finally, the new value contribution must be reasonably equivalent to the value received

19    (requirement number 5). In this case, a full blown accounting analysis is not necessary. The

20    company leases its restaurant locations and most of its equipment. It has a $2.3 million negative

21

22

23    [24] Matter of Woodstock Assoc., 19 F3d 312, 320 (7th Cir 1994); In re Ambanc La Mesa Limited
Partnership at 655.

24

25    [25] *See*, Exhibit B, page 6, to the disclosure statement. Docket No. 193.

26    [26] In re Ambanc La Mesa Limited Partnership at 656.

27    [27] Matter of Woodstock Assoc., at 320.

28    MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

net worth.[28]  It owns equipment and fixtures acquired from 2002 to the present which has about

$650,000 book value.[29]  The debtor argues the liquidation value of this type of equipment is only

30%,[30] and it has been the court's experience that this estimate is reasonable, if not generous.

That owned equipment is fully encumbered by the ARF lien.  So, there is no positive value to the

business as it is, and it is probably valuable to only David Duke as a vehicle to salvage his

Fairbanks Alma-Wellsprings property, after a lot of time and sweat.  I think this meets the 5th

requirement of reasonable equivalence.

   With respect to the equity in this case – the members interest in the LLC – under the

statutory cram down test, 11 USC § 1129(b)(2)(C), a member cannot retain an interest if an

ownership interest junior to it receives or retains an interest.  There are none.  But, the plan also

must not unfairly discriminate against them.  11 USC § 1129(b)(1) states:

> Notwithstanding section 510 (a) of this title, if all of the applicable
> requirements of subsection (a) of this section other than paragraph (8) are
> met with respect to a plan, the court, on request of the proponent of the
> plan, shall confirm the plan notwithstanding the requirements of such
> paragraph if the plan does not discriminate unfairly, and is fair and
> equitable, with respect to each class of claims or interests that is impaired
> under, and has not accepted, the plan.

   Why should a 50.1% owner acquire 100% ownership of the debtor for a mere $100,000?

Two of the recent members, Anderson and Wurm, put in $450,000 only a couple of years ago for

15%.  And, is it fair to put the fate of the guarantors in the hands of David Duke, whose abilities

they distrust?  I find that Duke can legitimately acquire 100% ownership for the same reasons his

investment allows cram down on the unsecured class.

---

[28]  *See*, December 23, 2009, balance sheet, Exhibit D to the disclosure statement.  Docket No. 193.

[29]  Exhibit C to the disclosure statement.  Docket No. 193.

[30]  Exhibit G to the disclosure statement.  Docket No. 193.

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

The 9th Circuit has adopted a test to determine whether there is unfair discrimination to a class of claims or interests in <u>Ambanc La Mesa Partnership</u> (although that case concerned classes of creditors):[31]

> Discrimination between classes must satisfy four criteria to be considered fair under 11 U.S.C. § 1129(b): (1) the discrimination must be supported by a reasonable basis; (2) the debtor could not confirm or consummate the Plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of the discrimination is directly related to the basis or rationale for the discrimination.

In this case: (1) the members, as a group, cannot agree how to proceed; (2) a consensual plan can not be developed by the members, given the dissension that exists; (3) the testimony has been uniform that David Duke's actions have not been motivated by malice; and, (4) absent breaking the impasse, the case would most likely turn into a chapter 7. I find that any discrimination inherent in David Duke acquiring 100% interest in the debtor is not unfair in the sense of 11 USC § 1129(b)(1).

3.2- <u>**Authority of David Duke to Impose the Plan of the Minority LLC Members**</u>- I view the plan not as David Duke speaking for the LLC in proposing to disenfranchise the existing members and giving himself 100% ownership, but David Duke speaking for himself. As such, a vote of the members is not critical.

Dr. Lange argues the plan runs afoul of the LLC governance statutes of AS 10.50. These provisions are trumped by the confirmation of a plan which provides for the removal of old equity in a manner that it does not unfairly discriminate against it, and replaces it with new equity.[32] For the reasons outlined in ¶ 3.1 and elsewhere in this memorandum, the nonadherence to the governance and voting procedures in AS 10.50 is not fatal to confirmation. By adoption of

---

[31] <u>In re Ambanc La Mesa Limited Partnership</u> at 656-57.

[32] 11 USC § 1123(b)(1); 7 *Collier on Bankruprtcy*,¶ 1123.02[1].

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

1   the new value exception,[33] the 9th Circuit has inherently sanctioned a plan the replaces old equity

2   with new equity.

3       3.3-  **The Assumability and Assignability of the Franchise**-  Under 11 USC § 365(c)(1), an

4   executory contract cannot be assumed or assigned if applicable nonbankruptcy law excuses the

5   other party from accepting or rendering performance to another entity other than the debtor or

6   debtor in possession.[34]

7       In the 9th Circuit, assumption of an executory contract involving the use of a franchisor's

8   trademarks and intellectual property can only occur with the franchisor's consent.[35]  Brinker

9   International says it will not tolerate the appointment of a chapter 11 trustee in this case.  It will

10  not trust its brand with someone not trained to honor and protect it, and will immediately seek

11  relief from stay.

12      The minority members objecting to the plan and proposing rejection of the Fairbanks lease

13  suggest that Brinker is bluffing, and will allow the restaurants to operate with a chapter 11 trustee

14  until a buyer suitable to Brinker is found.  Although they hint such a buyer is in the wings, no

15  evidence of this has been produced.  Also, it seems unlikely to the court that the only member

16  involved in the day-to-day running of the business, David Duke, would undertake the arduous

17  task of rebuilding the debtor if he cannot, in the bargain, try to save his Fairbanks assets – i.e., I

18  believe Duke would leave if the Fairbanks lease was rejected and/or a chapter 11 trustee was

19  installed.  If he abandons the debtor at this juncture, the franchise will probably be lost.

20

21

22      ───────────────────

23  [33]  *See*, ¶ 3.1 of this memorandum.

24  [34]  3 *Collier on Bankruptcy*, ¶ 365.06[1] (Matthew Bender Online ed 2010).

25  [35]  *Cf.*, In re Catapult Entertainment, Inc., 165 F3d 747 (9th Cir 1999), *cert. dismissed*, 528 US 924
    (1999) (a case dealing with the licensing of the nonexclusive nonexclusive license of a patent) and, *see*, In re
26  N.C.P. Marketing Group, Inc., 337 BR 230 (D Nevada 2005), *aff'd*. 279 Fed.Appx. 561 (9th Cir 2008), *cert. denied*
    129 SCt 1557 (2009), applying Catapult to a Lanham Act trademark situation.

27

28  MEMORANDUM DECISION FOR
    CONFIRMATION OF PLAN                                                    Page 17 of 21

1　　　The preservation of the franchise is key to recovery of any value from a reorganization in

2　this case, whether there is an operating or liquidating plan.  The proposed plan offers a reasonable

3　chance of preserving the franchise.  Following the suggestions of the objectors seems fairly certain

4　to bring down the house of cards by jeopardizing the franchise.

5　　　3.4- **Feasibility (and, What if Lori Leaves?)**- One of the requirements of confirmation is

6　that the court find that it is not likely to be followed by a liquidation or a further reorganization

7　proceeding, unless liquidation was contemplated by the plan.[36]  Debtor's turnaround since filing

8　chapter 11 is the result, in large part, of the outstanding efforts of its controller, Lori Carr.  She has

9　been working for the debtor since 2002, first as an independent accountant and then an

10　employee.

11　　　She attributes the turnaround to tighter controls of the business and constant attention to

12　improving income, watching costs, monitoring managers and employees and requiring them to

13　adhere to standards set by the franchisor.  None of these things would have been possible without

14　excellent managerial accounting provided by Ms. Carr to help identify and correct problems

15　before they become critical.

16　　　Her projections in this case have been remarkably accurate, and she is the one person

17　whose integrity and ability was acknowledged by all sides of the controversy, almost without

18　exception.  Her testimony indicated, however, that she had not decided if she would stay on after

19　confirmation, and I sense a burn-out factor.

20　　　David Duke acknowledges her importance and hopes she will stay, but says if she does not,

21　she can be replaced.  The decree of improvement since the petition was filed must be attributed to

22　both Lori Carr's handling the accounting function and David Duke's managing the operation.

23　And, if she does leave, I do not believe she will do so without helping the debtor find a competent

24　replacement.

25

26　　　　　[36]  11 USC § 1129(a)(11).

27

28　MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN

*Collier on Bankruptcy* sets out some of the considerations courts often address when deciding feasibility issues. These include:[37]

- ■   The possibility of failure is not fatal.

- ■   Some factors often considered:

     (1) the adequacy of the debtor's capital structure;

     (2) the earning power of its business;

     (3) economic conditions;

     (4) the ability of the debtor's management;

     (5) the probability of the continuation of the same management; and

     (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

The plan is projected to play out over ten years.  Projections for that long a time are tenuous, but the alternative is dismal.  There is no white knight in the wings.  Many entities (GE Capital, Brinker International, the three landlords, and FSA) can trip this case into chapter 7 if a plan is not confirmed now.  Considering the criteria regarding feasibility, there is a reasonable possibility of success which should be seized.  In that sense, the plan is feasible.

3.5- **The Prisoner's Dilemma (Dr. Lange and John DeHaven)**-  The remaining Prisoner's Dilemma involves Dr. Lange.  No good deed goes unpunished, and in trying to give a financial boost to his cousin he got himself into a financial mess of a dimension that he had not contemplated.

He feels he cannot trust his fate to David Duke, based on his observation of him in 2009 during a time of crisis.  He has remaining guarantees to Brinker International and the Anchorage landlords.  Currently, there are about $330,000 in arrears on these two obligations.

---

[37]  7 *Collier on Bankrupcy*, ¶ 1129.02[11] (Matthew Bender Online ed 2010).

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN                                                    Page 19 of 21

1    Dr. Lange argues for rejection of the Fairbanks lease and  . . .  what?  Neither he nor the

2  other opponents of confirmation have offered anything concrete.  A chapter 11 trustee will not be

3  tolerated by Brinker.  The Wasilla landlord is on the verge of pulling the plug.  David Duke has

4  been the sole member managing the operation for over a year, and no one could immediately step

5  in without the business falling apart.

6    David Duke has admitted conflicts of interest by virtue of his interest in the Fairbanks

7  landlord.  On the other hand, but for these conflicts and Duke's hope to preserve his Fairbanks

8  asset, he would probably not be willing to invest years of his life to turn the debtor around.

9    With or without confirmation, Dr. Lange's guarantees continue.  In this sense, his choice is

10  a Morton's Fork.  If the operations ended today, he would be faced with lease defaults in the

11  scheduled rent alone of about $52,000 per month for the Anchorage lease.  It is a unique

12  restaurant  property which probably would not be immediately rented.  If it takes a year to lease,

13  this equates to a $624,000 guarantee obligation.  If it can only be relet for $42,000 per month, he

14  would have $10,000 month liability for the deficiency until the original lease terms end.

15    The same goes for John DeHaven.  There was no testimony about his ability to respond to

16  the substantial guarantee damages, but I assume the guarantee obligations would be devastating to

17  him, too.  And, DeHaven is also a guarantor of the Fairbanks lease.  I take judicial notice that

18  Jason Kimmel filed a Chapter 7 bankruptcy in Anchorage on March 31, 2010, listing as potential

19  creditors the landlords and franchisor, and many other of debtor's creditors in his schedules.[38]

20    While confirmation is not Dr. Lange's or John DeHaven's choice, if the plan succeeds, their

21  guarantee obligations to the Anchorage landlord and Brinker International (and DeHaven's

22  obligation for Fairbanks and Wasilla) would start to disappear.  With an improving economy,

23  even if the plan does fail, a failure during better times leaves more options for another solution.

24

25  _____

26    [38] A10-00265-HAR, In re Jason Ira Kimmel and Teresa Marie Kimmel, US Bankruptcy Court for the
District of Alaska.

27

28  MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN                                                                                        Page 20 of 21

In deciding whether or not to confirm the plan, I have been guided by a judicial version of "first do no harm." And, I have determined that confirming the plan is in the best interest of the creditors and, probably, for Dr. Lange and John DeHaven, themselves. For the creditors, it is not a Morton's Fork – confirmation is clearly a superior choice. Hopefully it will be for Dr. Lange and John DeHaven, too.

4- **CONCLUSION**- I will ask debtor's attorney to lodge an order of confirmation in as simple a form as possible and without any extraneous findings, after incorporating all the last minute deals, such as with FSA and ARF.[39] The form should be circulated to the attorneys active in this case to solicit their approval as to form. Any objections to the form of the order can be addressed at an upcoming hearing.

DATED:  June 1, 2010

_____
/s/ Herb Ross
HERB ROSS
U.S. Bankruptcy Judge

Serve:
David Bundy, Esq., for the debtor
Erik LeRoy, Esq., for MCN Construction, Inc. and JCN Development, LLC
Michael Mills, Esq., for Dr. Richard Lange
Michael Parise, Esq., for Brinker International, Inc.
Daniel Coffey, Esq., for John Emmi
Kathryn Black, Esq., for Alma-Wellsprings, LLC
David Oesting, Esq., for GE Capital Franchise Finance Corporation
Gary Elmer, Esq., for Advance Restaurant Finance, LLC
Jeffrey Misley, Esq., for Food Services of America, Inc.
Gary Sleeper, Esq., for Delta Leasing, LLC
John DeHaven, equity owner, 2033 Brandelyn, Anchorage, AK 99506
Leslie Anderson, equity owner, 7901 Zermatt Ave., Anchorage, AK 99507
Robert Wurm, equity owner, 331 E. Wisner Lake Road, Lynden, WA 98264
Kay Hill, Asst. US Trustee
Clerk
          6/1/10                                                                D7325

---

[39] *See*, Official Form 15.

MEMORANDUM DECISION FOR
CONFIRMATION OF PLAN                                            Page 21 of 21